## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**NOVO NORDISK, INC.,**

     Plaintiff,

v.                                         Case No. 8:23-cv-1503-WFJ-TGW

**BROOKSVILLE
PHARMACEUTICALS INC.,**

     Defendant.

_____/

## <u>ORDER</u>

Before the Court is Defendant Brooksville Pharmaceuticals, Inc.'s ("Brooksville" or "Defendant") Motion for Summary Judgment. S-Dkt. 118-2; Dkt. 144. Plaintiff Novo Nordisk, Inc. ("Novo Nordisk" or "Plaintiff") filed a response in Opposition, S-Dkt. 168-1, to which Defendant filed a Reply, S-Dkt. 176-1. The Court held oral argument on the motion for summary judgment on April 25, 2025. Dkt. 183. Upon careful review, the Court grants Defendant's Motion for Summary Judgment.

## BACKGROUND

Plaintiff Novo Nordisk is an international pharmaceutical company with approval from the Food and Drug Administration ("FDA") to produce drugs

containing semaglutide. S-Dkt. 168-3 ¶¶ 1–2. Plaintiff sells three FDA-approved, prescription drugs that use semaglutide as the primary ingredient: Wegovy® 2.4 mg injection for chronic weight management; Ozempic® 0.5 mg, 1 mg, or 2 mg injection for adults with type 2 diabetes; and Rybelsus® 7 mg or 14 mg tablets for adults with type 2 diabetes. *Id.* Defendant Brooksville is a pharmacy that sells compounded drugs containing semaglutide. S-Dkt. 118-3 ¶¶ 1, 14–15; S-Dkt. 168-2 ¶ 14.

## I.    Compounding Under the FDCA

Pharmacy compounding is governed by Section 503A[1] of the Federal Food, Drug, and Cosmetic Act ("FDCA"), Pub. L. No. 75-717, 52 Stat. 1040 (codified as amended at 21 U.S.C. § 301 *et seq.*). Under Section 503A, a pharmacist may not compound "any drug products that are essentially copies of a commercially available drug product." 21 U.S.C. § 353a(b)(1)(D). However, Congress maintained a limited exemption to allow compounded drugs "for an identified individual patient based on the receipt of a valid prescription order or a notation, approved by the prescribing practitioner, on the prescription order that a compounded product is necessary for the identified patient." *Id.* § 353a(a); *see also id.* § 353a(b)(2) ("For purposes of paragraph [21 U.S.C. § 353a(b)(1)(D)], the term 'essentially a copy of a

---

[1] Section 353a of Title 21 of the United States Code is referred to as Section 503A within the FDA Modernization Act of 1997. Pub. L. No. 105-115 (1997).

commercially available drug product' does not include a drug product in which there is a change, made for an identified individual patient, which produces for that patient a significant difference, as determined by the prescribing practitioner, between the compounded drug and the comparable commercially available drug product.").

Importantly, Ozempic and Wegovy were on the FDA's drug shortage list from approximately March 31, 2022, until February 21, 2025. S-Dkt. 118-3 ¶ 13; S-Dkt. 168-2 ¶ 13; *see* 21 U.S.C. § 356e(a). Because Ozempic and Wegovy were on the FDA's drug "shortage list," the FDA did not consider these drugs to be "commercially available," and therefore, the limitations on compounding "inordinate amounts" of "essentially copies of a commercially" approved drug were temporarily lifted. 21 U.S.C. § 353a(b)(1)(D); *id.* § 353b(a)(2)(A)(ii).[2] As such, compounding pharmacies (like Brooksville) were permitted to compound "essentially copies" of Ozempic and Wegovy without a patient-specific prescription, and "outsourcing facilities" were allowed to compound the active pharmaceutical ingredients. *See id.* §§ 353b(a)(2)(A)(ii), (a)(5), (d)(2)(A).

While Ozempic and Wegovy were on the shortage list, Brooksville compounded injectable semaglutide. S-Dkt. 118-3 ¶ 15; S-Dkt. 168-2 ¶ 14. Brooksville's semaglutide/cyanocobalamin and semaglutide injections have a

---

[2] *See Compounded Drug Products That Are Essentially Copies of a Commercially Available Drug Product Under Section 503A of the Federal Food, Drug, and Cosmetic Act*, Food and Drug Administration Guidance Document (Jan. 2018) at 5.

labeled strength of 2.5/1mg and 2 mg/mL, respectively. S-Dkt. 118-3 ¶ 15; S-Dkt.
168-2 ¶ 15. The cost of Brooksville's compounded semaglutide ranges between $70
(for the 1mL vial) and $150 (5mL vial). S-Dkt. 118-3 ¶ 16. Brooksville also offers
compounded semaglutide/cyanocobalamin for $180. S-Dkt. 168-2 ¶ 16. Ozempic
and Wegovy are no longer on the FDA's drug shortage list. Dkt. 144 at 2; S-Dkt.
168-2 ¶ 13. As such, Brooksville claims it will now revert to the FDCA's traditional
compounding standard and "only sell compounded drugs containing semaglutide
pursuant to individualized prescriptions calling for a custom compound that is
materially different from Novo's FDA-approved drugs." Dkt. 144 at 3 (citing Dkt.
137-1); *see* 21 U.S.C. §§ 353a(a), (b)(2).

## II.    The Instant Litigation

Novo Nordisk's central claim is that Brooksville is manufacturing and selling
adulterated and misbranded drugs in violation of the Florida Drug and Cosmetic Act
("Florida DCA"), Fla. Stat. § 499.005(1); *id.* §§ 499.006(2), (7); *id.* § 499.007(1).
Dkt. 40 ¶¶ 40–57. Semaglutide is created with an active pharmaceutical ingredient
("API"). S-Dkt. 118-3 ¶ 17. Brooksville spot checks to ensure that the APIs it obtains
are from FDA-registered manufacturers that can provide a certificate of analysis
certifying that the API content complies with United States Pharmacopeia ("USP")
guidelines. S-Dkt. 168-2 ¶ 17; S-Dkt. 118-3 ¶ 17. Novo Nordisk does not sell its
semaglutide API to any pharmacy to compound injectable or oral semaglutide

products. S-Dkt. 168-3 ¶ 5. Brooksville's compounded semaglutide is tested for endotoxins and sterility through a third-party laboratory before being dispensed to patients. S-Dkt. 118-3 ¶¶ 18–19; S-Dkt. 168-2 ¶¶ 18–19. Novo Nordisk has characterized impurities in its pharmaceutical-grade semaglutide API as part of the FDA approval process. S-Dkt. 168-3 ¶ 7. Impurities are components of a drug product that are not the API or an excipient in the drug product. *Id.* ¶ 8.

In June 2023, Novo Nordisk obtained a sample of Brooksville's compounded semaglutide (lot 230425A) through a third party called IP Services. S-Dkt. 118-3 ¶ 28. In June 2024 and July 2024, Novo Nordisk obtained two additional semaglutide compound samples, through IP Services, from Brooksville (lot 240610B and lot 240715C). *Id.* ¶ 55. The parties highly contest the facts surrounding the transportation of these three compounded samples; however, it is undisputed that these samples were transported from Florida to Denmark to be tested by Novo Nordisk. *Id.* ¶¶ 45, 80; S-Dkt. 168-2 ¶¶ 45, 80. Plaintiff did various tests on the three compounded samples, which were compared against a Novo Nordisk reference sample: (1) high-performance liquid chromatography (RP-HPLC); (2) high-molecular-weight protein ("HMWP") content test (SEC-LC); and liquid chromatography-mass spectrometry (LC-MS). S-Dkt. 118-3 ¶¶ 46, 82, 90–95. Novo Nordisk's reference samples used for testing are kept frozen. *Id.* ¶ 83; S-Dkt. 168-2 ¶ 83.

The RP-HPLC test results for the June 2023 compounded sample showed a potency of 1.62 mg/ml, which is 81% of the labeled potency of 2.0 mg/ml. S-Dkt. 168-2 ¶ 52. The test results for the June 2024 compounded sample showed a potency of 1.72 mg/ml, which is 86% of the labeled potency of 2.0 mg/ml. *Id.* ¶ 85. The test results for the July 2024 compounded sample showed a potency of 1.74 mg/ml, which is 87% of the labeled potency of 2.0 mg/ml. S-Dkt. *Id.* Third-party testing (by Pharmetric Laboratory) of the June 2024 and July 2024 compounded samples showed a potency of 92.9% and 95.8%, respectively. S-Dkt. 118-3 ¶¶ 86–87; S-Dkt. 168-2 ¶¶ 86–87.

As for the impurities in Brooksville's compounded semaglutide, the HMWP test results for the June 2023 compounded sample showed that the level of impurities in Brooksville's compounded semaglutide was within Novo Nordisk's own drug product specifications for HMWP content. S-Dkt. 118-3 ¶ 54; S-Dkt. 168-2 ¶ 54. The HMWP test results for the June 2024 compounded sample showed that Brooksville's compounded semaglutide had a HMWP content of less than 0.2%, hydrophilic impurities content of 1.0%, hydrophobic impurities 1 content of 1.2%, hydrophobic impurities 2 content of 0.4%, and sum of impurities content of 2.7%. S-Dkt. 118-3 ¶ 90. The HMWP test results for the July 2024 compounded sample showed that Brooksville's compounded semaglutide had a HMWP content of less than 0.2%; hydrophobic impurities content of 0.7%; hydrophobic impurities 1

content of 0.9%; hydrophobic impurities 2 content of 0.3%; and sum of impurities of 1.9%. *Id.* ¶ 91.

Finally, the LC-MS test results for the June 2023 compounded sample showed that Brooksville's compounded semaglutide had twelve impurities above or equal to 0.1%, including two unknown impurities, as well as four amino acid additions and deletions. S-Dkt. 168-2 ¶ 50; S-Dkt. 118-3 ¶ 50. The LC-MS test results for the June 2024 and the July 2024 compounded samples concluded that "[t]he purity of the API in the DP [Drug Product] from Brookesville [sic] has increased compared to the purity of the API in the DP analyzed in 2023[,] [p]resences of known DP stability indicating impurities (isomers, formaldehyde adduct etc.) verified[,] . . . [m]inor differences in API impurity profile compared to NN API[, and] . . . [o]ther [i]mpurities present in levels below 0.02%." S-Dkt. 118-41 at 9; S-Dkt. 118-3 ¶ 94.

Ozempic and Wegovy have had more than 10,000 serious adverse events reported to the FDA, including events that have resulted in hospitalization or death. S-Dkt. 118-3 ¶ 100; S-Dkt. 168-2 ¶ 100. As of December 31, 2024, there have been 386 deaths reported for Ozempic and 51 deaths reported for Wegovy according to the FDA Adverse Events Reporting System. S-Dkt. 118-3 ¶¶ 101–102; S-Dkt. 168-2 ¶¶ 101–102. Unlike Novo Nordisk, compounders such as Brooksville are not required to report adverse events to the FDA. S-Dkt. 168-2 ¶¶ 100–101. Novo Nordisk alleges that the impurities in Brooksville compounded semaglutide pose

immunogenicity risks that can lead to anaphylaxis, cytokine release syndrome, and central nervous system complications. Dkt. 40 ¶ 21; S-Dkt. 168-2 ¶ 94; S-Dkt. 168-3 ¶¶ 50–52. However, there are no reports of injury due to impurities in Brooksville's compounded semaglutide in the record. S-Dkt. 118-3 ¶¶ 104–105; S-Dkt. 168-2 ¶¶ 104–105, 111 ("Novo has not itself received an adverse event report regarding Brooksville's compounded semaglutide . . . Novo is not able to pinpoint adverse events attributable to Brooksville."). Novo only points to email complaints from five Brooksville customers who reported that their prescriptions were ineffective. S-Dkt. 168-3 ¶¶ 56–58.

On July 6, 2023, Plaintiff filed suit. Dkt. 1. Plaintiff alleges that Defendant violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201–.213, by manufacturing and selling to the public, without FDA approval, drugs containing semaglutide. Dkt. 1 ¶¶ 28–32. The Court dismissed Plaintiff's Complaint without prejudice since its FDUTPA claim based on a predicate violation of Fla. Stat. § 499.023 was impliedly preempted by the FDCA. Dkt. 33 at 8.

On November 29, 2023, Plaintiff filed an Amended Complaint seeking only injunctive and declaratory relief. Dkt. 40. Specifically, Plaintiff seeks "to enjoin Brookville from its unlawful business practice of selling adulterated and misbranded . . . semaglutide[,] and which pose potential significant risks to patient health." *Id.*

8

at 1. Plaintiff contends it can bring a cause of action under FDUTPA for injunctive relief because Defendant is violating a "statute . . . which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203(3)(c); Dkt. 40 ¶ 52; *see* Fla. Stat. § 501.204(1); *id.* § 501.211(1). Brooksville is allegedly violating the Florida DCA's prohibition on selling adulterated and misbranded drugs. Dkt. 40 ¶¶ 40–57; *see* Fla. Stat.§ 499.005(1); *id.* §§ 499.006(2), (7); *id.* § 499.007(1). This violation of the Florida DCA is causing Novo Nordisk to suffer injury, including economic harm due to lost sales and "harm to its goodwill and reputation." Dkt. 40 ¶ 56.

Defendant now moves for summary judgment, arguing a lack of Article III standing, mootness, implied preemption by the FDCA, and a failure to establish certain elements of Plaintiff's FDUTPA claim. Dkt. S-118-2; Dkt. 144.

## LEGAL STANDARD

Summary judgment is only appropriate when there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed R. Civ. P. 56(a). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving

party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001) (noting a court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party"). Once the moving party satisfies its initial burden, it shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e), (c). Speculation or conjecture cannot create a genuine issue of material fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

The court may not weigh evidence to resolve a factual dispute; if a genuine issue of material fact is present, the court must deny summary judgment. *Hutcherson v. Progressive Corp.,* 984 F.2d 1152, 1155 (11th Cir. 1993). Likewise, the court should deny summary judgment if reasonable minds could differ on the inferences arising from undisputed facts. *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992).

Importantly, a district court is only required to consider "the cited materials" when deciding a summary judgment motion, Fed. R. Civ. P. 56(c)(3), and "[m]aking district courts dig through volumes of documents and transcripts would shift the burden of sifting from petitioners to the courts . . . [D]istrict court judges are not required to ferret out delectable facts buried in a massive record." *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011). "[T]here is no burden upon the district court to distill every potential argument that could be made based on the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1239 (11th Cir. 2012) (per curiam) (citing *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc)).

## DISCUSSION

Defendant moves for summary judgment on several grounds: (1) Plaintiff does not have Article III standing; (2) Plaintiff's claim is now moot since Ozempic and Wegovy are no longer on the FDA's drug shortage list; (3) the FDCA impliedly preempts Plaintiff's claim; and (4) Plaintiff cannot prove essential elements of its FDUTPA claim. Dkt. S-Dkt. 118-2; Dkt. 144. The Court will address each argument in turn.

11

## I.    Article III Standing

Article III standing requires plaintiffs to demonstrate that: (1) they suffered an

"injury-in-fact," (2) there is a causal connection between the asserted injury-in-fact

and the challenged action of the defendant, and (3) "the injury will be redressed by

a favorable decision." *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001) (citation

omitted). Injury-in-fact is established when a plaintiff "shows that he or she suffered

an invasion of a legally protected interest that is concrete and particularized and

actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S.

330, 339 (2016) (citation and quotations omitted). A concrete injury is "real, and not

abstract." *Id.* at 340. A particularized injury "affect[s] [a] plaintiff in a personal and

individual way." *Id.* at 339. Claims for injunctive relief, moreover, require a "real

and immediate . . . threat of *future* injury." *Shotz*, 256 F.3d at 1081 (emphasis in

original) (citation omitted). Economic injury is sufficient to establish standing.

*Debernardis v. IQ Formulations LLC*, 942 F.3d 1076, 1084 (11th Cir. 2019).

The party invoking federal jurisdiction bears the burden of proving each of

these standing elements "with the manner and degree of evidence required at the

successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561

(1992). As such, "in response to a summary judgment motion, 'the plaintiff . . . must

"set forth" by affidavit or other evidence specific facts'" showing the defendant

injured him. *Ga. Republican Party v. Secs. & Exch. Comm'n*, 888 F.3d 1198, 1201

(11th Cir. 2018) (quoting *Lujan*, 504 U.S. at 561).

Defendant contends that "Novo has not shown any concrete injury that is

fairly traceable to Brooksville and that would be redressed by a favorable judicial

outcome." S-Dkt. 118-2 at 13. Moreover, Defendant argues that this Court "lacks

diversity jurisdiction over the single count arising under Florida state law, because

Novo has failed to adduce any evidence that the amount in controversy exceeds the

$75,000 threshold." *Id.* On the other hand, Plaintiff states that "[s]imple math makes

it clear that Novo's claim far exceeds the statutory requirement." S-Dkt. 168-1 at 7.

While the dismissal Order previously found that Plaintiff had standing, the

Court only considered the injury-in-fact element. Dkt. 33 at 4. Specifically, the Court

reasoned that:

> Plaintiff sufficiently stated a present and future economic injury-in-fact
> that is concrete and particularized. . . . Plaintiff is the only
> pharmaceutical company with express FDA approval to create,
> manufacture, and sell drugs containing semaglutide. Dkt. 1 ¶ 34.
> Because Defendant also creates, manufactures, and sells drugs that
> contain semaglutide in the same geographical areas where Plaintiff
> conducts business, *id.*, the parties are in economic competition. *Id.* ¶ 35.
> Thus, the Court can reasonably infer that any sale by Defendant
> reduces, and will continue to reduce, Plaintiff's individual profits.

*Id.* at 4–5. With a full record before the Court, this conclusion regarding the injury-

in-fact element has not changed. Each sale of compounded semaglutide is likely a

sale taken from Novo Nordisk. S-Dkt. 168-2 ¶ 108; S-Dkt. 168-3 ¶ 12. While

Brooksville is correct that some of its 24,000 customers might choose another compounder over Novo Nordisk, the Court can still reasonably infer that Novo Nordisk has lost thousands of potential patients to Brooksville, who has filled over 50,000 prescriptions for semaglutide. *See* S-Dkt. 168-2 ¶ 108; S-Dkt. 168-3 ¶ 12. If the Court follows Brooksville's position that at least 50% of customers cannot afford Novo Nordisk's branded version (S-Dkt. 118-2 at 14), the lost profit would still be over $600,000 when applying a conservative price of $25 per month. *See* S-Dkt. 168-2 ¶ 113; S-Dkt. 168-3 ¶ 13. Novo Nordisk's deposition testimony (from its corporate representative) describing economic harm is sufficient evidence of economic injury to survive summary judgment. S-Dkt. 168-2 ¶ 108; S-Dkt. 168-3 ¶ 12; *see Walters v. Fast AC*, LLC, 60 F.4th 642, 648 (11th Cir. 2023) (finding "deposition testimony describing [plaintiff's] lost time, economic harm, and emotional distress" was sufficient to survive summary judgment).

However, while Plaintiff may have suffered an injury-in-fact, the Court must still consider whether Plaintiff's standing to bring its claim is now moot because a change in circumstances has made "redressability by the court an impossibility." *Keister v. Bell*, 29 F.4th 1239, 1250 (11th Cir. 2022).

## II.    Mootness

Even if Plaintiff initially had standing to bring its claims for declaratory and injunctive relief, those claims have become moot. During the pendency of the instant

14

litigation, the FDA removed Ozempic and Wegovy from the FDA's drug shortage list. S-Dkt. 118-3 ¶ 13; S-Dkt. 168-2 ¶ 13. As discussed above, while on the FDA's drug shortage list, compounding pharmacies (like Brooksville) were compounding "inordinate amounts" of drugs that were "essentially a copy of a commercially available drug product" containing semaglutide (i.e., Ozempic and Wegovy). However, now that the shortage for Ozempic and Wegovy is over, compounding pharmacies must revert to the traditional statutory limitations on compounding which only permit compounding where "a change [is] made for an identified individual patient, which produces for that patient a significant difference, as determined by the prescribing practitioner, between the compounded drug and the comparable commercially available drug product." 21 U.S.C. § 353a(b)(2).

Defendant argues that "the end of the semaglutide shortage renders Novo's request for injunctive relief moot." Dkt. 144 at 4. Specifically, "the end of the semaglutide shortage will, by force of law, compel Brooksville to cease the allegedly offending conduct—i.e., the sale of compounded drugs which are 'essentially a copy' of Ozempic and Wegovy—and Brooksville must instead compound preparations at the direction of a physician or medical provider that are materially different from Novo's products." *Id.* Plaintiff, however, asserts that "because Brooksville intends to continue compounding semaglutide products [via individualized patient prescriptions], Novo continues to have claims that such

conduct is unlawful because those products are adulterated and misbranded." S-Dkt. 168-1 at 26. Moreover, because Brooksville was compounding in bulk prior to the FDA's declaration of a shortage for Ozempic and Wegovy, Plaintiff speculates that "there is nothing stopping [Brooksville] from making that same unilateral judgment in the future," so the Court should "doubt that Brooksville will engage in *any* cessation of its current activities." *Id.* at 26–27 (emphasis in original).

Article III, § 2 of the Constitution limits a federal court's jurisdiction to "Cases" or "Controversies." U.S. Const. art. III, § 2. "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)). As such, "Article III requires a "[c]ase[ ]" or "[c]ontrovers[y]" to exist at all times during the litigation. *Alvarez v. Smith*, 558 U.S. 87, 90–91 (2009). "A moot case is nonjusticiable[,] and Article III courts lack jurisdiction to entertain it." *Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla.*, 382 F.3d 1276, 1281 (11th Cir. 2004).

Although Defendant raises mootness in the context of its summary judgment motion, the Eleventh Circuit has "repeatedly said that when a district court disposes of a case on justiciability (mootness) grounds[, the Eleventh Circuit] will treat the district court's determination as if it was ruling on a motion to dismiss for lack of

subject matter jurisdiction under [Federal Rule of Civil Procedure 12(b)(1)], even if the district court mistakenly has labeled its ruling a grant of summary judgment." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 (11th Cir. 2007); *see Troiano*, 382 F.3d at 1278 n.2 ("The district court's finding of mootness was embodied in an order granting the defendant's motion for summary judgment. Subject matter jurisdiction is appropriately dealt with by means of a motion to dismiss under [Rule] 12(b)(1), and we will treat the district court's summary judgment ruling as if it were a ruling on a Rule 12(b)(1) motion."). Accordingly, the Court applies a Rule 12(b)(1) standard only for this mootness section of the Order.

Challenges to subject matter jurisdiction under Rule 12(b)(1) are either "facial" or "factual." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990). A factual attack, as Brooksville asserts here, "challenge[s] 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.'" *Id.* (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). When the attack is factual, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and "the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* (quoting *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981)).

When the only relief requested is declaratory and injunctive (as is the case here), it is possible for subsequent events after litigation begins to render the matter moot, *Seay Outdoor Advert., Inc. v. City of Mary Esther, Fla.*, 397 F.3d 943, 946 (11th Cir. 2005), by "mak[ing] it impossible for the court to grant 'any effectual relief whatever' to a prevailing party." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992); *see also Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266, 1283 (11th Cir. 2024) ("Usually, a case must be dismissed as moot if events that occur subsequent to the filing of a lawsuit deprive the court of the ability to give the plaintiff meaningful relief." (citation and quotations omitted)).

"Despite this general rule, a party cannot necessarily moot a case for injunctive relief by simply voluntarily agreeing to stop the allegedly illegal conduct." *Keister*, 29 F.4th at 1250 (citing *Troiano*, 382 F.3d at 1282–83); *see also Off Lease Only, Inc. v. LeJeune Auto Wholesale, Inc.*, 187 So. 3d 868, 870 (Fla. 3d DCA 2016) ("[M]ere voluntary cessation of conduct alleged to be in violation of FDUTPA does not necessarily foreclose [the plaintiff] from pursuing an action for injunctive relief."). This "voluntary-cessation exception" to mootness prevents a defendant from injuring a plaintiff again while evading judicial review. *Keister*, 29 F.4th at 1250. "There are circumstances where a defendant's voluntary cessation of challenged conduct may moot a case after all, but the standard for that is 'stringent':

A defendant's voluntary conduct may moot a case only if 'subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Cambridge Christian*, 115 F.4th at 1284 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Laidlaw*, 528 U.S. at 189 (alteration adopted) (quotation marks omitted). The Eleventh Circuit has identified three factors for determining whether a case has been rendered moot by a private actor's voluntary cessation:

> (1) whether the challenged conduct was isolated or unintentional, as opposed to a continuing and deliberate practice[,] (2) whether the defendant's cessation of the offending conduct was motivated by a genuine change of heart or timed to anticipate suit[,] and (3) whether, in ceasing the conduct, the defendant has acknowledged liability.

*Sheely*, 505 F.3d at 1184.

Here, Defendant's factual attack on subject matter jurisdiction weighs in favor of finding that the instant action is moot following the end of the Ozempic and Wegovy shortage. First, assuming that Defendant's compounded semaglutide somehow injured Plaintiff, any alleged violation was "isolated," not a "continuing and deliberate practice." As discussed above, Brooksville was legally permitted to compound semaglutide without patient-specific prescriptions while Ozempic and Wegovy were on the FDA's drug shortage list. *See* 21 U.S.C. § 353a(b)(1)(D); *id.* §§

353b(a)(2)(A)(ii), (a)(5), (d)(2)(A). Now that the FDA has removed Ozempic and Wegovy from the shortage list, Defendant has ended its non-patient-specific compounding and affirms it is no longer compounding "essentially copies" of semaglutide. Dkt. 144 at 3 (citing Dkt. 137-1).

Furthermore, while not entirely clear based on the record before the Court, the patient-specific semaglutide that Brooksville compounds post-shortage would presumably be "materially different" from the semaglutide it was compounding during the shortage. *See* S-Dkt. 176-1 at 9; Dkt. 144 at 3. Indeed, post-shortage, any prescription that Brooksville compounds for semaglutide must be based on "*a change*[] made for an *identified individual patient*, which produces for that patient a *significant difference*, as determined by the prescribing practitioner." 21 U.S.C. § 353a(b)(2) (emphasis added).

Second, as Brooksville correctly articulates, Brooksville's decision to cease compounding copies of semaglutide was not necessarily a "voluntary" cessation since it was legally required to stop compounding or risk violating 21 U.S.C. § 353a(b)(1)(D). Dkt. 144 at 6. The change in the FDA's shortage list during litigation shows Brooksville was likely "motivated by a genuine change of heart" (to comply with the FDCA and avoid federal penalties) and not necessarily a cessation to avoid litigation with Novo Nordisk. *See* 21 U.S.C. § 337(a) (stating the United States has sole enforcement authority under the FDCA). Indeed, Brooksville continued to

litigate this suit from its inception all the way to summary judgment, and only raised a voluntary cessation argument *after* a change in the FDA's shortage list during the pendency of the litigation. Because Defendant's choice to cease compounding copies of Ozempic and Wegovy was not "timed to anticipate the suit," factor two weighs in favor of mootness. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) (noting a "presumption" of future injury when cessation occurs in response to suit); *Jager v. Douglas County Sch. Dist.*, 862 F.2d 824, 833–34 (11th Cir. 1989) (declining to moot a case when the cessation came only "[u]nder the imminent threat of the [plaintiffs'] lawsuit").

Finally, Brooksville has not acknowledged liability, so this factor weighs against mootness. Regardless, given Defendant's original decision to compound semaglutide was in response to a national drug shortage, and given Defendant has stopped compounding "essentially copies" of Ozempic and Wegovy to comply with the FDCA following the end of said shortage, the Court finds that it is absolutely clear that the allegedly wrongful behavior (i.e., compounding misbranded and adulterated semaglutide in bulk) could not reasonably be expected to reoccur. Accordingly, the Court finds it can no longer provide "meaningful relief" to Plaintiff because the case is moot.

Even if the Court doubted Brooksville's voluntary cessation, the injunction sought by Plaintiff—"to enjoin  Brookville from its unlawful business practice of

21

selling adulterated and misbranded injectable [semaglutide]"—would be improper.

Dkt. 40 at 1. "It is well-established in this circuit that an injunction demanding that

a party do nothing more specific than 'obey the law' is impermissible." *Eland v.*

*Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006) (citing *Burton v. City of Belle Glade*,

178 F.3d 1175, 1201 (11th Cir. 1999)). Indeed, "obey-the-law" injunctions "lack

specificity and deprive defendants of the procedural protections that would

ordinarily accompany a future charge of a violation." *SEC v. Goble*, 682 F.3d 934,

949 (11th Cir. 2012). "Such injunctions are disfavored because they often run afoul

of Rule 65(d)'s requirement that injunctions state their terms specifically and

'describe in reasonable detail' the 'act or acts restrained or required.'" *United States*

*v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1361 (11th Cir. 2019) (quoting

Fed. R. Civ. P. 65(d)). "An injunction 'should clearly let [the] defendant know what

he is ordered to do or not to do' and 'should be phrased in terms of objective actions,

not legal conclusions.'" *Id.* at 1362 (quoting *Goble*, 682 F.3d at 950). However, "at

times an injunction that orders a defendant to comply with a statute may be

appropriate." *Goble*, 682 F.3d at 950. Such an injunction might be permissible when

the "statutory terms are specific[,] and the defendant clearly knows what conduct is

prohibited or required." *Askins & Miller*, 924 F.3d at 1362 (citing *Goble*, 682 F.3d

at 950–51).

Here, Novo Nordisk requests that this Court issue "a permanent injunction enjoining Defendant from continuing [its] unlawful and unfair business practices" (i.e., compounding adulterated and misbranded drugs). Dkt. 40 at 20. However, such a request is an impermissible "obey-the-law" injunction. If granted, the Court would be telling Brooksville to comply with the Florida DCA and cease selling a "drug . . . that is adulterated [and] misbranded." Fla. Stat. § 499.005(1). While the Florida DCA defines what counts as an adulterated and misbranded drug, these definitions are incredibly vague and wholly lack any specificity to put Brooksville on notice of what specific conduct would be enjoined. *See id.* §§ 499.006(2), (7) ("A drug or device is adulterated, if . . . [i]t has been produced, prepared, packed, or held under conditions whereby it could have been contaminated with filth or rendered injurious to health. . . . and its strength differs from, or its purity or quality falls below the standard of, that which it purports or is represented to possess."); *id.* § 499.007(1) ("A drug or device is misbranded: If its labeling is in any way false or misleading.").

For example, what impurities with amino acid additions and deletions in Brooksville's compounded semaglutide would count as "contaminated" or "injurious to health?" Who would test the "purity" and "quality" of Brooksville's semaglutide to determine if it fell below a certain standard? What labeling counts as "false or misleading" when each semaglutide prescription compounded is discrete and patient-specific post-shortage? Put simply, the prohibited actions within the four

corners of this "obey-the-law" injunction would be overbroad and too vague for
Brooksville to discern or the Court to effectively enforce.[3] *See Hughey v. JMS Dev.
Corp.*, 78 F.3d 1523, 1532 n.12 (11th Cir. 1996) ("A person enjoined by court order
should only be required to look within the four corners of the injunction to determine
what he must do or refrain from doing.").

In addition to these Rule 65(d) specificity issues, Plaintiff's requested
injunction invites this Court to become the new investigative and enforcement arm
of the Florida Department of Business and Professional Regulation (the "Florida
DBPR"). The Florida DCA has a private enforcement bar that explicitly states it is
the Florida DBPR's job to "administer and enforce this part to prevent fraud,
adulteration, misbranding, or false advertising in the preparation, manufacture,
repackaging, or distribution of drugs, devices, and cosmetics." Fla. Stat. §
499.002(2); *see also id.* § 499.003(14) (defining "Department" as the Department of
Business and Professional Regulation); *Fields v. Mylan Pharms., Inc.*, 751 F. Supp.
2d 1257, 1259 (N.D. Fla. 2009) ("Nowhere does the [Florida DCA] state that it
provides for a private cause of action by an individual, and Plaintiff has provided no
authority supporting implication of such private cause of action.").

---

[3] On May 1, 2025, Novo Nordisk filed a notice of supplemental authority in response to the Court's questioning during the April 25th hearing about the hypothetical contents of an injunction. *See* Dkt. 185. In this supplement, Plaintiff points to the class action settlement approved by a district court in the Eastern District of New York that involved a different state statute, dissimilar material facts, and divergent legal issues. *Id.* at 3 (citing *Bangoura v. Beiersdorf, Inc.*, 1:22-cv-00291, Dkt. 36 (E.D.N.Y. August 11, 2022)). Plaintiff's second authority, *Doan Sols., LLC v. Creative Emarketing, Inc.*, No. 16-CV-62883, 2017 WL 6948718 (S.D. Fla. May 2, 2017), is equally unhelpful since the decision involved a motion for default judgment in a fraudulent misrepresentation case.

This enforcement power is not toothless. The Florida DCA gives the Florida DBPR the power to "administer oaths, take depositions, issue and serve subpoenas, and compel the attendance of witnesses and the production of books, papers, documents, or other evidence" during an investigation. When a "state attorney, county attorney, or municipal attorney" is informed of a violation by the Florida DBPR, the government attorney "shall cause appropriate proceedings to be instituted in the proper courts without delay and . . . prosecute[] [the Florida DCA violation] in the manner required by law." Fla. Stat. § 499.002(4). Finally, the penalties and remedies section authorizes the imposition of injunctions, administrative fines, and emergency orders suspending permits for violations of the Florida DCA. *Id.* § 499.066. Thus, the Florida Legislature has determined that the Florida DBPR—not private parties like Novo Nordisk—should investigate violations of the Florida DCA. The Court declines Novo Nordisk's request to improperly use FDUTPA's injunctive relief remedy, *see id.* § 501.211(1), to circumvent the Florida DCA's private enforcement bar, *see id.* § 499.002(2).

Accordingly, an injunction telling Brooksville to "obey the law" and comply with the Florida DCA would run afoul of Rule 65(d)'s requirement that an injunction states its term specifically and "describe in reasonable detail . . . the act or acts restrained." Fed. R. Civ. P. 65(d). Because Plaintiff does not seek money damages and only requests injunctive relief, Dkt. 40 at 1, Plaintiff's standing to bring its

FDUTPA claim is now moot because "redressability by [this] [C]ourt [is] an impossibility." *Keister*, 29 F.4th at 1250.

### III.    Implied Preemption

Even if Plaintiff's FDUTPA claim were not moot, the Court finds it would be impliedly preempted by the FDCA. Implied preemption occurs when "the scope of a statute indicates that Congress intended federal law to occupy a field exclusively . . . or when state law is in actual conflict with federal law." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995). Here, Defendant relies only on "conflict" preemption since the FDCA states that all enforcement authority lies with the United States. *See* 21 U.S.C. § 337(a) ("[A]ll such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States"); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001). Private enforcement of the FDCA is barred. *Nexus Pharms. Inc. v. Cent. Admixture Pharm. Servs.*, 48 F.4th 1040, 1044 (9th Cir. 2022).

Nevertheless, a claim that alleges "the breach of a well-recognized duty owed to [a plaintiff] under state law" will survive implied preemption, even if based on conduct that violates the FDCA. *Jacob v. Mentor Worldwide*, LLC, 40 F.4th 1329, 1336 (11th Cir. 2022) (citing *Godelia v. Doe*, 881 F.3d 1309, 1317 (11th Cir. 2018) and *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1327 (11th Cir. 2017)). To "escape implied preemption," the alleged conduct must "give rise to liability under state law

even if the Act did not exist." *Id.* For example, in the *Jacob*, *Godelia*, and *Mink* trilogy, all the plaintiffs relied upon violations of the FDCA as evidence of negligence in their state law manufacturing defect claims. *Id.* at 1338–39; *Godelia*, 881 F.3d at 1318, 1320; *Mink*, 860 F.3d at 1330. However, all the plaintiffs avoided implied preemption because the lack of FDCA compliance was only used as evidence to support their personal injury claims brought under "traditional state tort law[,] which had predated the federal enactments in question[]." *Buckman Co.*, 531 U.S. at 353; *see Jacob*, 40 F.4th at 1338–39; *Mink*, 860 F.3d at 1330.

In contrast, a claim that "relies on a state statute which itself relies on the federal statute, not traditional state tort law theory," *Nexus*, 48 F.4th at 1046,[4] "exist[s] solely by virtue of the FDCA . . . requirements." *Buckman*, 531 U.S. at 353. Where "the existence of [the FDCA] is a critical element" of a case, the claim is impliedly preempted. *Id*. As such, to avoid preemption, Plaintiff must show its FDUTPA claim fits through a "narrow gap": "a plaintiff has to sue for conduct that violates a federal requirement (avoiding express preemption) but cannot sue only because the conduct violated that federal requirement (avoiding implied preemption)." *Jacob*, 40 F.4th at 1336 (quoting *Mink*, 860 F.3d at 1327).

---

[4] In *Nexus,* the Ninth Circuit affirmed the district court's finding of implied preemption. 48 F.4th at 1051. There, the plaintiffs claimed that drug-compounding facilities violated state statutes prohibiting the sale of drugs not approved by the FDA. *Id*. at 1044. The Ninth Circuit held that these types of claims are akin to private enforcement of the FDCA, *id.* at 1049, and affirmed dismissal because the plaintiff sought to "enforce its interpretation" of the FDCA, which was a task reserved for the FDA. *Id.* at 1050.

This Court previously found Plaintiff's first Complaint to be impliedly preempted as pled because the alleged Florida DCA violation relied on the FDCA. The Court's dismissal Order explained that:

> [T]he instant case [is] more analogous to *Nexus* than to *Jacob*, *Godelia*, and *Mink*. Plaintiff's claim, as written, is that Plaintiff suffers economic loss due to Defendant's [Florida DCA] violation of [Fla. Stat. § 499.023], which is itself "a law that says in substance 'comply with the FDCA.'" [*Nexus*, 48 F.4th] at 1050. The Court can identify no alleged conduct that would "give rise to liability under state law even if the [FDCA] did not exist." *Jacob*, 40 F.4th at 1336 (citations omitted). To survive a motion to dismiss, Plaintiff must plead factual content that allows the Court to infer "the breach of a well-recognized duty owed to [Plaintiff] under state law." *Id.*

Dkt. 33 at 6–7; *see also* Fla. Stat. § 499.023 ("A person may not sell, offer for sale, hold for sale, manufacture, repackage, distribute, or give away any new drug unless an approved application has become effective under s. 505 of the [FDCA].").

However, following the dismissal of the initial Complaint, Plaintiff filed an Amended Complaint that skillfully avoids any reference to the FDCA. *See* Dkt. 40; S-Dkt. 168-1 at 10–12. Plaintiff now contends its FDUTPA claim survives implied preemption since its "theory of liability is untethered to any federal law, or state statute besides FDUTPA," and even if Plaintiff was alleging a predicate violation under the Florida DCA to bring its FDUTPA claim, "[t]his basis for liability is also completely independent of any federal law." S-Dkt. 168-1 at 11. The Court disagrees.

Plaintiff cites to one paragraph in its Amended Complaint to support its argument that its FDUTPA claim can stand alone without any predicate violation. *Id.*

(citing Dkt. 40 ¶ 44). However, the previous paragraph makes it clear Plaintiff's
FDUTPA claim is *not* standing alone (without a predicate violation); rather, it is
based on Defendant allegedly engaging in "unfair, unconscionable, and deceptive
conduct in 'trade' and 'commerce' in violation of FDUTPA when it unlawfully
manufactures and sells its *adulterated* and *misbranded* drugs in Florida[.]" Dkt. 40
¶ 43 (emphasis added). The terms "adulterated" and "misbranded" are neither
mentioned in the text of FDUTPA, *see* Fla. Stat. § 501.204(1), nor listed in the
Florida caselaw that defines what counts as an "unfair practice" or "deception," *see*
*Caribbean Cruise Line, Inc. v. Better Business Bureau of Palm Beach County, Inc.*,
169 So.3d 164, 169 (Fla. 4th DCA 2015) (defining "unfair practice" and
"deception"). But Plaintiff did not pull "adulterated" and "misbranded" out of thin
air; the terms are clearly drawn from the Florida DCA. *See* Fla. Stat. § 499.005(1);
*id.* § 499.006; *id.* § 499.007.

It is clear that the FDUTPA claim is based on predicate violations of the
Florida DCA. *See* Dkt. 40 ¶ 22 ("Novo Nordisk brings this action under [FDUTPA]
to stop Defendant from unlawfully manufacturing, marketing, selling, and
distributing its *adulterated and misbranded* drugs. Novo Nordisk seeks a declaration
that Defendant's business practices violate FDUTPA by manufacturing, distributing,
and selling its *adulterated and misbranded* drugs and an injunction prohibiting
Defendant from committing such violations." (emphasis added)).

Since Plaintiff's FDUTPA claim is based on predicate violations of the Florida DCA for selling adulterated and misbranded semaglutide, the Court must determine whether the claim avoids implied preemption. Unlike the first Complaint based on a Fla. Stat. § 499.023 predicate violation, Plaintiff contends there is no implied preemption since "[t]he Florida DCA prohibits the sale of adulterated or misbranded drugs[, and] it defines adulteration and misbranding without reference to any federal law." S-Dkt. 168-1 at 11. The Court disagrees. Because "the existence of [the FDCA] is a critical element" of the case, Plaintiff's FDUTPA claim that Brooksville is selling adulterated and misbranded semaglutide is impliedly preempted. *Buckman*, 531 U.S. at 353

First, Plaintiff seems to ignore that the express purpose of the Florida DCA is conformity and uniformity with the FDCA. Fla. Stat. § 499.002(1)(b), (c) ("This part is intended to: [p]rovide uniform legislation to be administered so far as practicable in conformity with the provisions of, and regulations issued under the authority of, the Federal Food, Drug, and Cosmetic Act and that portion of the Federal Trade Commission Act which expressly prohibits the false advertisement of drugs, devices, and cosmetics[, and] [p]romote thereby uniformity of such state and federal laws, and their administration and enforcement, throughout the United States.").

Second, in conformity and uniformity with the FDCA, the Florida DCA's definitions for "adulteration" and "misbranding" mirror the FDCA's definitions for

"adulteration" and "misbranding." *Compare* 21 U.S.C. § 351(a)(1) ("if it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health[.]") *with* Fla. Stat. § 499.006(2) ("It has been produced, prepared, packed, or held under conditions whereby it could have been contaminated with filth or rendered injurious to health."); *compare* 21 U.S.C. § 351(c) ("its strength differs from, or its purity or quality falls below, that which it purports or is represented to possess.") *with* Fla. Stat. § 499.006(7) ("its strength differs from, or its purity or quality falls below the standard of, that which it purports or is represented to possess."); *compare* 21 U.S.C. §§ 352(a), (b) ("A drug or device shall be deemed to be misbranded . . . If its labeling is false or misleading in any particular" and listing labeling requirements) *with* Fla. Stat. §§ 499.007(1), (2) ("A drug or device is misbranded: If its labeling is in any way false or misleading" and listing labeling requirements that mirror federal requirements).

Additionally, within the provisions of Fla. Stat. § 499.006 and § 499.007, there are multiple references and incorporations to the "federal act"—i.e., the FDCA. *See* Fla. Stat. §§ 499.006(5), (6), (11); *id.* §§ 499.007(11)–(13), (16); *id.* § 499.003(19) (defining the "Federal Act" as the "Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*."). Plaintiff's choice to only cite the subsections of Fla. Stat. § 499.006 and § 499.007 that do not reference the FDCA does not save its claim from implied

preemption. The Court reads the cited portions of the Florida DCA in context with the larger statutory scheme, which is to be in conformity and uniformity with the FDCA. *See Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 441 (2019) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). At bottom, the substance of the Florida DCA's provisions concerning adulterated and misbranded drugs is borrowed from the FDCA standards.

Third, and most importantly, because Plaintiff's FDUTPA claim relies on a violation of another state statute (i.e., the Florida DCA's provisions on adulteration and misbranding) which itself relies on a federal statute (i.e., the FDCA's provisions on adulteration and misbranding), Plaintiff is not bringing a "*traditional state tort law*" claim which "predate[s] the federal enactments in question[.]" *Buckman*, 531 U.S. at 353 (distinguishing between preempted "fraud-on-the-agency claims" and "traditional state tort law [that] predated the federal enactments in question[]" which survive implied preemption so long as they do not privately enforce a duty owed to the FDA). In other words, Brooksville's duty not to produce adulterated and misbranded semaglutide does not predate the FDCA, and it is a duty that Brooksville owes to the FDA, not Novo Nordisk. Indeed, as Ninth Circuit found in *Nexus*, there is a "distinction" between "a traditional common law tort action" alleging "harm to a patient," which "might" provide a private cause of action that "escape[s]

preemption," and a claim that a manufacturer (like Novo Nordisk) "is harmed economically because the defendant [like Brooksville] violated the FDCA." 48 F.4th at 1050.

Eleventh Circuit precedent supports this distinction. As discussed above, the plaintiffs in *Jacob*, *Godelia*, and *Mink* were all *consumers* who avoided implied preemption by using violations of the FDCA as evidence to support their *personal injury* (manufacturing defect) claims under Florida (tort) law. *Jacob*, 40 F.4th at 1338–39; *Godelia*, 881 F.3d at 1318, 1320; *Mink*, 860 F.3d at 1330. In contrast, Novo Nordisk's FDUTPA claim to enjoin Brooksville from selling adulterated and misbranded semaglutide—which is not a traditional state tort law claim based on an injured consumer who used Brooksville's compounded drugs—falls on the impliedly preempted side because the purported Florida DCA violation (selling adulterated and misbranded drugs) "is of a law that says in substance 'comply with the FDCA,' not a traditional common law tort." *Nexus*, 48 F.4th at 1050. Because the substance of the asserted violations of Fla. Stat. §§ 499.006(2), (7) and § 499.007(1) is borrowed from and in conformity with the FDCA, the existence of that federal enactment is a "critical element" in Plaintiff's case. *Buckman*, 531 U.S. at 353. Accordingly, Novo Nordisk's FDUTPA claim fails to "escape implied preemption," because the alleged conduct does not "give rise to liability under state law even if the Act did not exist." *Jacob*, 40 F.4th at 1336.

Plaintiff, however, raises an interesting argument that if "a claim based on a violation of the Florida DCA is merely a claim to enforce the Federal FDCA[,]" this would "render the Florida DCA a nullity, leaving even the Florida Attorney General powerless to pursue a FDUTPA claim for a violation of the Florida DCA against companies disseminating adulterated and misbranded drugs in Florida." S-Dkt. 168-1 at 14 n.6. But such an argument confuses *private enforcement* of the FDCA with *public enforcement* by state authorities of their own state statutes. There is no express preemption provision in the prescription drug context, *see Wyeth v. Levine*, 555 U.S. 555, 574 (2009), so states are free to pass statutes that mirror the FDCA. Indeed, Florida did just that and passed the Florida DCA, which likewise provided for public enforcement by state authorities and barred private enforcement. *See* Fla. Stat. § 499.002(2).

In other words, states (like Florida) are only limited to "the same public enforcement mechanisms that are permitted by the very federal law they are copying." *Davidson v. Sprout Foods, Inc.*, 106 F.4th 842, 864 (9th Cir. 2024) (Collins, J., concurring in part and dissenting in part). Therefore, it seems that Plaintiff's complaint is not that the Florida BPR would be unable to publicly enforce the Florida DCA; rather, that Novo Nordisk has been both privately barred by the Florida DCA *and* impliedly preempted from privately enforcing the FDCA against

compounders like Brooksville who dug into Novo Nordisk's profits during the national shortage of Ozempic and Wegovy.

Finally, on April 21, 2025, Plaintiff also filed a notice of supplementary authority. In this filing, Plaintiff points to *Zyla Life Scis., L.L.C. v. Wells Pharma of Houston, L.L.C.*, 134 F.4th 326 (5th Cir. 2025), where the Fifth Circuit recently found that claims under six state unfair-competition laws,[5] which were based on predicate violations of state statutes that incorporated the FDCA, were not impliedly preempted. 134 F.4th at 331. *Zyla Life*, however, is neither binding on this Court nor impairs or significantly conflicts with this Court's analysis that Plaintiff failed to bring a (non-preempted) traditional tort law claim. *Zyla Life* was on a motion to dismiss, based upon no apparent factual record. *Id.* The underlying claim in *Zyla Life* differs from here. The *Zyla Life* defendant was accused of selling "unapproved," i.e., bootleg, pharmaceuticals. Adulteration and manufacturing defects were not alleged. *See Zyla Life Scis., LLC v. Wells Pharma of Houston, LLC*, No. 4:22-CV-04400, 2023 WL 6301651, at *2, 5 (S.D. Tex. Sept. 27, 2023).[6] No such allegation is present here. One does not need FDCA expertise to stop the sale of unapproved drugs.

---

[5] California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-l-105(z), and Colorado Common Law of Unfair Competition; Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*.; the Tennessee Consumer Protection Act, Tenn. Code Ann. 47-18-104(b)(43)(C); the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-20; and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b.

[6] The district court denied the plaintiff's request for leave to amend to allege manufacturing or adulteration defects. *See Zyla Life*, 2023 WL 6301651, at *5.

*Zyla Life* discussed *Wyeth v. Levine*, 555 U.S. 555 (2009), and found that the "FDCA itself permits States to regulate conduct related to drug safety and effectiveness concurrently with the Federal Government . . . [s]imply put, 'Congress did not regard state tort litigation as an obstacle to achieving its purposes.'" *Id.* at 336 (citing *Wyeth*, 555 U.S. at 575). This is true, but Plaintiff Novo Nordisk is not bringing a traditional state tort or anything that resembles one. And, unlike here, the plaintiff in *Zyla Life* did not ask the district court to adjudge adulteration or impurities in a drug that was otherwise lawfully marketed and permitted to be produced. *See Zyla Life*, 2023 WL 6301651, at *2.  In short, the plaintiff in *Zyla Life* did not ask the district court to police ongoing manufacturing processes of a lawful drug.

The Eleventh Circuit has allowed a "narrow gap" where a plaintiff can bring a traditional state tort law claim that avoids express preemption by suing for conduct that violates the FDCA and avoids implied preemption since the conduct violates an independent duty under state tort law (like a negligence or products claim based on a manufacturing defect). *Jacob*, 40 F.4th at 1336 (citation omitted). Plaintiff's FDUTPA claim, however, is impliedly preempted because the alleged violation under the Florida DCA for selling adulterated and misbranded drugs is actually a violation of a duty owed to the FDA under the FDCA. *See Novo Nordisk Inc. v. WELLHealth Inc.*, No. 3:23-CV-782-ACC-LLL, 2025 WL 699769, at *6 (M.D. Fla.

36

Jan. 30, 2025) ("The FDUTPA claim hinges on FDCA compliance, even though Novo Nordisk has not explicitly alleged that WELLHealth violated the FDCA.").

## IV.    Plaintiff's FDUTPA Claim

Finally, even if Plaintiff's FDUTPA claim was not moot or impliedly preempted, the Court finds summary judgment is warranted on the merits. FDUTPA provides a private cause of action for losses caused by statutory violations. Fla. Stat. § 501.211(1). FDUTPA violations include "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203(3)(c). Plaintiff points to the Florida DCA prohibition on selling adulterated and misbranded drugs, Fla. Stat. § 499.005(1), as the predicate violation under FDUTPA. Dkt. 40 ¶¶ 48–52.

To establish a claim under FDUTPA, a plaintiff must prove "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016); *accord Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006). However, when seeking a declaratory judgment or injunction, a plaintiff must prove "(1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So. 3d 207, 214 (Fla. 4th DCA 2019). A deceptive act is one "likely to deceive a consumer acting reasonably in the same

circumstances." *State, Office of Attorney Gen., Dept. of Legal Affairs v. Commerce Commercial Leasing, LLC*, 946 So. 2d 1253, 1258 (Fla. 1st DCA 2007) (citation omitted). An unfair act has been defined as "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Marrache v. Bacardi U.S.A.*, Inc., 17 F.4th 1084, 1098 (11th Cir. 2021) (citing *PNR, Inc. v. Beacon Prop. Mgmt.*, Inc., 842 So. 2d 773, 777 (Fla. 2003)).

While a plaintiff need not be a "consumer" under FDUTPA to file suit, *see* Fla. Stat. § 501.203(7), "Florida case law requires a plaintiff to prove harm to a consumer or consumers." *State Farm Mut. Auto. Ins. Co. v. At Home Auto Glass LLC*, No. 8:21-CV-239-TPB-AEP, 2024 WL 4349246, at *4 (M.D. Fla. Sept. 30, 2024); *see also Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 860 (11th Cir. 2023) (finding that a plaintiff bringing a FDUTPA claim must "prove there was an injury or detriment to consumers") (quoting *Caribbean Cruise Line*, 169 So. 3d at 169); *CMR Constr. & Roofing, LLC v. UCMS, LLC*, No. 21-11183, 2022 WL 3012298, at *3 (11th Cir. July 29, 2022) ("[I]n order to satisfy the first element for a claim for both damages and injunctive relief under FDUTPA—i.e., a deceptive act or unfair practice—the plaintiff must allege that the relevant act or practice was harmful to a consumer."); *Stewart Agency*, 266 So. 3d at 212 ("While an entity does not have to be a consumer to bring a FDUTPA claim, it still must prove the elements of the

claim, including an injury to a consumer." (citing *Caribbean Cruise Line*, 169 So. 3d at 169)).

Defendant argues Plaintiff has failed to establish the consumer injury element of FDUTPA since Novo Nordisk cannot identify "a single instance in which a patient was injured from the use of Brooksville's compounded semaglutide." S-Dkt. 118-2 at 23. Plaintiff does not dispute that the record is devoid of a single adverse event from Brooksville's compounded semaglutide. *See* S-Dkt. 118-3 ¶ 105; S-Dkt. 168-2 ¶¶ 104–105, 111. Instead, Novo Nordisk points to a handful of email complaints from Brooksville customers who reported that their prescriptions were "ineffective," *see* S-Dkt. 168-3 ¶¶ 56–57, and asserts that "Brooksville misstates the relevant inquiry. In actuality, Novo is required to prove only that Brooksville's actions are 'likely to cause consumer harm.'" S-Dkt. 168-1 at 16 (collecting district court cases). The Court disagrees.

Here, it is Novo Nordisk that "misstates the relevant inquiry"—actual patient harm is the proper standard at the summary judgment stage. While Plaintiff is correct that under a *motion to dismiss* standard, a plaintiff only needs to allege that the conduct in question is "likely to cause consumer harm," *see CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*, No. 3:16-CV186-J, 2018 WL

905752, at *15 (M.D. Fla. Feb. 15, 2018),[7] under a *motion for summary judgment*
standard, Florida law requires Plaintiff to prove that Defendant's adulterated
semaglutide inflicted actual harm on at least one Florida consumer, that is,
"committed an unfair or deceptive trade practice that injured a consumer." *Stewart
Agency*, 266 So. 3d at 212, 214 (affirming summary judgment for defendant because
"there was no evidence that any consumer was injured by any unfair practice"); *see
also State Farm*, 2024 WL 4349246, at *6 (M.D. Fla. Sept. 30, 2024) (granting
"summary judgment for Defendants on State Farm's FDUTPA claims in Count I and
Count II of the amended complaint, and denies State Farm's motion for summary
judgment as to the FDUTPA claim in Count I, based on the lack of evidence of
consumer harm"); *S. Broward Hosp. Dist. v. ELAP Servs., LLP*, No. 20-61007-CIV,
2023 WL 6547748, at *10 (S.D. Fla. Sept. 30, 2023) ("Plaintiff's failure to
demonstrate actual or likely consumer harm, after full discovery and extensive
briefing, entitles Defendants to summary judgment on Plaintiff's FDUTPA claim.");
*Caribbean*, 169 So. 3d at 169 (holding that a FDUTPA claimant must "prove

---

[7] All the district court cases Plaintiff cites (*see* S-Dkt. 168-1 at 16) applied a Rule 12(b)(6) dismissal standard. *See Car Body Lab Inc. v. Lithia Motors, Inc.*, No. 21-CV-21484, 2021 WL 2658693, at *3 (S.D. Fla. June 22, 2021), (finding on a motion to dismiss, "[a] plaintiff alleging a violation of FDUTPA must allege that the conduct in question is likely to cause actual harm to the end consumer"), *report and recommendation adopted*, No. 21-21484-CIV, 2021 WL 3403208 (S.D. Fla. Aug. 4, 2021); *Sandshaker Lounge & Package Store LLC v. RKR Beverage Inc*, No. 317CV00686MCRCJK, 2018 WL 7351686, at *2 n.3 (N.D. Fla. Nov. 5, 2018) (declining to reconsider previous dismissal order when the plaintiff made "no allegations clearly showing these actions resulted in, or were likely to result in, harm to consumers").

that *there was an injury or detriment to consumers* in order to satisfy all of the elements of a FDUTPA claim" (emphasis in original)).[8]

Plaintiff attempts to claim that since compounders like Brooksville are not required to report adverse events to the FDA, Novo Nordisk should be absolved of its (shifted) burden to come forward with evidence showing a genuine issue of material fact concerning actual consumer injury. S-Dkt. 168-1 at 17. But most defendants in a FDUTPA lawsuit are not sending adverse event reports to a state or federal agency. That's why parties in a lawsuit conduct discovery. Plaintiff's hypothetical possibility of some future injury to Florida consumers based on impurities in compounded semaglutide (which could be materially different given that Brooksville is only providing patient-specific prescriptions post-shortage) is insufficient to survive summary judgment. Thus, the "unfair trade practice" portion of Plaintiff's FDUTPA claim for equitable relief cannot survive summary judgment because there is no evidence that such a practice was "injurious to consumers." *Stewart Agency*, 266 So. 3d at 214.

---

[8] The statement in *Caribbean Cruise Line* that a FDUTPA damages claim requires proof of consumer harm could be considered dictum. *See* 169 So. 3d at 169. However, the same cannot be said of *Stewart Agency*'s holding regarding FDUTPA's actual consumer injury requirement for damages and injunctive relief on summary judgment. 266 So. 3d at 212, 214. There, the Florida appellate court not only stated the rule from *Caribbean Cruise Line* but applied it to uphold summary judgment for the defendant because the plaintiff, a competing automotive dealership, failed to present "evidence that [the defendant] committed an unfair or deceptive trade practice that injured a consumer." *Id.* at 212. As eloquently stated by another district court, "[i]f the statement by the court in *Caribbean Cruise Line* was dictum, with *Stewart Agency*, 'it emerged from the realm of dictum into the point actually decided.'" *State Farm Mut. Auto. Ins. Co. v. Home Auto Glass LLC*, No. 8:21-CV-239-TPB-AEP, 2025 WL 418015, at *3 (M.D. Fla. Feb. 6, 2025) (quoting *Cate v. Beasley*, 299 U.S. 30, 31 (1936)).

Plaintiff's "deceptive trade practice" claim based on Brooksville's misbranding does not fare any better. The alleged deceptive act is that Brooksville deceived consumers by selling compounded semaglutide with a potency less than what is reported on the label. Dkt. 40 ¶¶ 33–37. While Plaintiff can point to five (out of 24,000) Brooksville customers who reported that their semaglutide perceptions were "ineffective," *see* S-Dkt. 168-3 ¶¶ 56–58, Plaintiff also concedes that it has not tested the potency of the compounded semaglutide these customers received, *id.* ¶ 58. Again, Plaintiff has not shown any evidence that a Florida consumer suffered actual harm from Brooksville's misbranded semaglutide.[9] After extensive discovery and exhaustive briefing, Plaintiff's failure to provide any evidence of consumer harm entitles Defendant to summary judgment on Plaintiff's FDUTPA claim.

## CONCLUSION

For the above reasons, Plaintiff's sole FDUTPA claim is moot, impliedly preempted, and fails on the merits for failure to show consumer injury. Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

---

[9] While not argued in Plaintiff's response brief, to the extent Novo Nordisk is arguing it is a "consumer" under FDUTPA since it was able to acquire and test three samples of Brooksville's compounded semaglutide, *see* S-Dkt. 118-3 ¶¶ 31–32, 58–59, district courts have already rejected such an argument. For purposes of the consumer harm element, "consumer" means a "purchaser and consumer of goods or services." *State Farm*, 2024 WL 4349246, at *5 (citing *Whertec, Inc. v. Salmon*, No. 3:20-cv-1254-BJD-PDB, 2021 WL 3555676, at *6 (M.D. Fla. Apr. 28, 2021)). When IP Services, a litigation consulting group acting surreptitiously, obtained the three samples of compounded semaglutide under false pretenses from Brooksville, Novo Nordisk did not act as a purchaser of goods and services (i.e., not acting as a patient prescribed semaglutide). As such, harm to Novo Nordisk due to lost profits, goodwill, and reputation, without more, does not show the required consumer harm under FDUTPA. *See CMR*, 2022 WL 3012298, at *5 ("Because CMR alleged harm solely to itself—in its capacity as the construction service provider, and not to the consumer of its services—CMR failed to allege a harm to a consumer."); *State Farm*, 2024 WL 4349246, at *5 ("In these transactions, State Farm acted as a provider of insurance services, not as a purchaser of goods or services, and therefore harm to State Farm itself, without more, does not show the required consumer harm.").

1. Defendant Brooksville's Motion for Summary Judgment, S-Dkt. 118-2, is **GRANTED.**

2. The Clerk is **DIRECTED** to enter judgment in favor of Defendant Brooksville, to **TERMINATE** all pending motions and deadlines, and to **CLOSE** this case.

**DONE** and **ORDERED** in Tampa, Florida, on May 12, 2025.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**Copies Provided To**
Counsel of Record